UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

************************************

GERARD T. OUIMETTE,
Petitioner

v.

UNITED STATES OF AMERICA,
Respondent

No. 99-489-T

************************************

## INTRODUCTION

I, Gerard T. Ouimette, make affidavit and state:

1. I am the petitioner in the above matter. On October 26, 1995 I was convicted after trial by jury of extortion in the United States District Court for the District of Rhode Island and was sentenced to life pursuant to the "three strikes" provision of 18 U.S.C. §3559 (c) (1) (A).

2. I filed a timely appeal that was heard and denied.

3. I filed a *pro se* petition for habeas corpus pursuant to 18 U.S.C. §2255 that was denied.

4. This affidavit is in support of my Motion pursuant to Fed. R. Civ. P. 60. The significant constitutional claim raised in my petition is ineffective assistance of counsel in that my trial attorney improperly dissuaded me from testifying in my own defense despite my adamant and repeated requests to do so and resulting in ineffective assistance of counsel.

5. Had I been permitted to testify in my own defense, I would have been able to not only contradict the testimony of the government's witnesses but I would have offered genuinely exculpatory evidence about the nature and circumstances of my contact with the alleged extortion claimants and the government's informants. The verdict would have been different and I would have been found not guilty of all or most of the charges.

MY RIGHT TO TESTIFY IN MY OWN DEFENSE

At no time did I waive my right to testify in my own defense.

1. At my trial I was represented by Richard Egbert, Esq. I was tried together with co-defendant Robert DeLuca as a result of the denial of my motion to sever.

2. At various times prior to the start of my trial and during the presentation of the government's case I told my attorney, Richard Egbert, Esq., that I wanted to take the stand in my own defense.[1] I explained to him what would be the substance of my testimony and told him that my testimony would give the jury reasonable doubt about the government's case and in particular reveal the circumstances surrounding various recorded conversations with government witnesses especially Robert Buehne and Paul Calenda. My attorney at first just listened and made no comment.

3. About one month before my trial started, Attorney Egbert came to see me. At that time he told me he was not going to call me as a witness. We had a heated conversation about this and he said "What about Joe DeLuca?"[2] I said "My testimony can't hurt Joe DeLuca", to which he replied, "I just don't want to put you on the stand." His response made me uncomfortable and I wondered why Attorney Egbert made that statement.

4. As my trial progressed I became more and more convinced that I would have to testify and explain to the jury the circumstances surrounding statements I made that they were hearing on tape recordings made by government informants Paula Coppolla and her boyfriend Robert Beuhne. These tapes were the heart of the government's case especially since the alleged victim of one extortion charge (Paul Calenda) was not called to testify in front of the jury and was never subjected to cross examination. I told my attorney point blank that I was the only one who could contradict Paula Coppolla, explain the harsh words on these audiotapes and show the jury that what they were hearing was completely out of character for me and more importantly not evidence of a criminal act.

5. I would also have been able to explain how I came to be involved with government witnesses Paula Coppolla, James Gellerman and David Duxbury. Since Gellerman was the only witness who provided evidence that his actions toward Calenda and Duxbury were directed by me, I was the only one who could contradict that evidence. Only with my testimony would the jury have had a complete picture of my interactions with the 2 alleged victims, Calenda and Duxbury, and they could have easily concluded that my conduct was not criminal.

---

[1] Due to Attorney Egbert's trial schedule, I initially had these discussions with my co-counsel Louis Robbio, Esq. with whom I discussed my case on 3-4 occasions. These discussions included my desire to testify in my own defense. We particularly discussed the tape recordings of my conversations with 2 proposed government witnesses, Robert Beuhne and Paula Coppola and 1 alleged victim, Paul Calenda. Attorney Robbio agreed that my testimony would be important to my defense. When Attorney Egbert became available I reiterated to him my desire to testify in my own defense.

[2] Joseph DeLuca is the brother of my co-defendant Robert DeLuca and was not indicted.

6. During the second week of my trial Attorney Egbert said to me "I hate to bust your bubble, but you're going to lose this case." Since Attorney Egbert had decided that he would not put me on the stand, at that point I asked him to call David Gomez as a defense witness. Mr. Gomez would have testified that the alleged extortion victim, Paul Calenda had several guns and had stated he was going to shoot me. David Gomez would have given the jury an understanding of the anger I came to experience toward Paul Calenda thinking that he was looking to harm me after I agreed to get in the middle of a serious dispute between him and Mr. Deluca. His testimony might have explained some of my recorded statements. Attorney Egbert did not subpoena Mr. Gomez. Again, my earlier belief was reinforced, namely, that my only defense was to testify and explain the audiotapes and my conduct to the jury.

7. Attorney Egbert did mention that if I testified the government could bring my criminal history to the attention of the jury. This did not concern me because government witness Paula Coppolla had been permitted to testify in front of the jury about my prior incarceration.

8. My need to testify became even more crucial once Anthony Cardinale, Esq., the attorney representing my codefendant (*Robert DeLuca)* began to cross examine the government informants. He did his best to get these informants, especially James Gellerman, to say that his client (*Robert DeLuca*) had no knowledge of the alleged extortion for which we were on trial. When Mr. Gellerman testified "No" in response to Attorney Cardinale's question about whether Robert (Bobby) DeLuca knew anything about the extortion, I knew beyond any doubt that taking the stand in my own defense was my only choice and hope of an acquittal. I could not let that and other similar statements go unchallenged.

9. The nature of Attorney Cardinale's cross examination of the government informants made it clear to me that his approach was to conduct his client's defense as if he were another prosecutor trying to convince the jury that only I and not his client was guilty of the charges. I had to take the stand to clear this up. At that point I told my lawyer "The gloves have to come off. I need to testify."

10. I told my lawyer I believed that I could show a reasonable jury that I was actually innocent. I insisted "I want to get on the stand." Then to my shock he again said "What about Joe DeLuca?" I said "Joe DeLuca was not even indicted and couldn't be indicted based on my testimony." I explained to my lawyer what little I would have said about Joseph DeLuca. My lawyer still did not want me to testify. I then began to doubt that my lawyer was 100% in my corner. I began to wonder if he had a conflict of interest or that by letting me testify he believed he would be put in a compromising position with regard to the DeLuca brothers.

11. I told my lawyer again "I've got to get on that stand." Again he said "What about Joe DeLuca?" I said "Richard, it's your job to make sure I can testify. That's what I paid you for." I also said "How can I get on the stand without your help? Joe DeLuca had nothing to do with what I have to say on the stand."

12. My lawyer would not call me to the witness stand. He strenuously discouraged me from testifying. He did not give me a chance to fully explain to him what my testimony would have been and I was prevented from providing the jury with my

explanation of the events described by the government informants. My lawyer shut the door on me. Other than his references to Joe DeLuca, I don't know why my lawyer did not want me to testify. I know it couldn't have had anything to do with trial strategy because he told me "We blew the case after the first week."

13. Unfortunately because my lawyer did not put me on the witness stand, I never got the opportunity to explain any of the conversations on the government's tapes or contradict the government informants who testified against me and who described my conduct in a way that led the jury to believe that I was guilty of extortion.

Signed under the pains and penalties of perjury this 2 day of April, 2008.

Gerard T. Ouimette